IN THE

# SUPREME COURT OF TENNESSEE,

FOR THE

# WESTERN DIVISION.

JACKSON, APRIL TERM, 1890.

LANCASTER MILLS *v.* MERCHANTS' COTTON-PRESS COM-
PANY AND OTHERS.

(*Jackson.* June 7, 1890.)

1. COMMON CARRIER. *Effect of the exemption from loss by fire.*

Common carrier, protected by a valid stipulation in his bill of lading against liability for loss of goods by fire, is not responsible for any loss resulting from that cause, unless his negligence was the proximate cause of the fire. (*Post, pp. 31, 32.*)

Case cited and approved: Railway Co. *v.* Manchester Mills, 88 Tenn., 653.

2. SAME. *Same. Pleadings in suit for such loss.*

Hence a bill states no cause of action which merely avers loss by fire of goods intrusted to carrier for shipment under bill of lading containing a valid clause exempting him from liability for loss by fire. Complainant must, in such case, aver the additional fact, which he must

1—5 P

Lancaster Mills *v.* Merchants' Cotton-press Company and Others.

establish by proof, that the carrier's negligence was the proximate cause of the fire causing the loss. (*Post, pp. 31, 32.*)

3. SAME.    *Same.    No relief granted upon such bill taken for confessed.*

Upon such defective bill no relief can be awarded, even where there is prayer for general relief and the carrier suffers decree *pro confesso.* (*Post, p. 32.*)

Cases cited and approved: McGavock *v.* Elliott, 3 Yer., 374; Ross *v.* Ramsay, 3 Head, 16.

4. SAME.    *Construction of clause exempting from liability for loss by fire.*

A valid stipulation in a bill of lading exempting carrier from liability for loss of cotton by fire " while at depots, stations, yards, landings, warehouses, or in transit," exempts him from liability for loss thereof by fire, occurring without fault of himself or agent, while the cotton is in warehouse for compression by his agent—the warehouseman. (*Post, p. 31.*)

5. SAME.    *Validity of the fire clause exemption.*

*Prima facie* a fire clause exemption is valid and supported by sufficient consideration when it is found in a through bill of lading wherein through freight rates are granted over two or more distinct carrier lines. (*Post, p. 31.*)

Case cited and approved: Railway Co. *v.* Manchester Mills, 88 Tenn., 653.

6. WAREHOUSEMAN.    *Measure of responsibility.    General rule.*

A warehouseman, being a mere bailee for hire, is held, with reference to goods deposited for storage and performance of labor upon them, to ordinary care and diligence only, which is correctly defined as " the care and diligence which good and capable warehousemen are ac-customed to show under similar circumstances, or that which business men experienced and faithful in the particular department are accus-tomed to exercise when in the discharge of their duties." (*Post, pp. 33-35.*)

Case cited and approved: Waller *v.* Parker, 5 Cold., 477.

7. SAME.    *Liability for loss by fire.*

A warehouseman is not, in the absence of special contract, responsible for goods destroyed by fire while in his custody for storage and the performance of labor upon them unless his negligence was the proxi-mate cause of the fire that caused the loss.  (*Post, pp. 35, 36.*)

Lancaster Mills *v.* Merchants' Cotton-press Company and Others.

8. SAME.    *Same.    Defective pleading.*

And in a suit to charge him for such loss the plaintiff must aver in the pleadings, and the burden is upon him to prove, that the warehouseman's negligence was the cause of the fire from which the loss resulted. (*Post, pp. 36, 37.*)

Cases cited and approved: Railway Co. *v.* Manchester Mills, 88 Tenn., 653; Runyan *v.* Caldwell, 7 Hum., 134.

9. SAME.    *Fact of loss by fire no proof of negligence.*

The mere fact that goods in custody of a warehouseman were destroyed by fire affords, of itself, no presumption of his negligence. (*Post, p. 36.*)

Case cited and approved: Railway Co. *v.* Manchester Mills, 88 Tenn., 653.

10. SAME.    *Causal connection between negligence and loss essential.*

To charge even a negligent warehouseman with value of goods destroyed by fire while in his custody, it must appear that there was causal connection between his negligence and the fire. (*Post, pp. 35, 36.*)

11. FIRE INSURANCE.    *Obligations of carrier and warehouseman with reference to insurance.    Case stated.*

A railway carrier contracted with a warehouseman to receive for it from customers, and compress, all cotton designed for shipment over its line from a named depot. It was stipulated further that the warehouseman should insure the cotton in solvent companies for the benefit of the carrier while it remained in the warehouse.

The course of business pursued under this contract was as follows: The carrier gave to its customers permits authorizing the warehouseman to receive cotton as its agent. Upon deposit of the cotton under these permits the warehouseman gave to each customer a "dray ticket" therefor. Upon the face of some of these tickets it was stated that the cotton was "fully covered by the policies of insurance" held by the warehouseman, and in others that it was "covered by" the warehouseman "with insurance for the owners as interest may appear." The warehouseman uniformly made verbal representations to customers that their cotton was "fully insured" for benefit of carrier and owners. Upon presentation of this "dray ticket" the customer received bill of lading from carrier in lieu thereof. Under that bill of lading the carrier was exempted from liability for loss of the cotton by fire while it was in the warehouse for compression. Loss of the cotton by fire occurred, without negligence of carrier or warehouseman, while it remained in warehouse for compression. The warehouseman had not covered it with insurance as stipulated with carrier or as represented to customers. (*Post, pp. 25, 26.*)

Lancaster Mills *v.* Merchants' Cotton-press Company and Others.

*Held:* Carrier is not liable; and that warehouseman is liable, but not
as an *insurer* against loss by fire. (*Post, pp. 39, 40.*)

12. SAME. *Same. Contract of warehouseman with customer, how ascertained.*

And that the contract and true relations between the warehouseman
and depositors of cotton should be ascertained from a view of the
entire series of transactions considered as one whole, and not alone
from the face of the "dray tickets." (*Post, pp. 40–43.*)

13. SAME. *Same. Effect of surrender of dray ticket to carrier.*

And that therefore the surrender of the "dray tickets" to the carrier,
and acceptance of bills of lading in lieu thereof, did not end the
warehouseman's obligations to depositors with reference to carrying
insurance for their benefit. (*Post, pp. 40–43.*)

14. SAME. *Same. Warehouseman's contract construed.*

The warehouseman's contract with depositors was to *carry* insurance in
solvent companies to cover their cotton, not to stand himself as
insurer against loss by fire; and therefore his liability is not direct
and absolute, as that of an insurer, but only for loss or damage re-
sulting to depositors from his failure to comply with his contract or
representations as to the *carrying* of insurance for their benefit.

15. SAME. *Same. Carrier's power as to insurance.*

A carrier has such insurable interest in goods intrusted to him for car-
riage that he may insure not only his *interest* or his *liability*, but the
whole value of the goods. And in such case he may collect the
whole value, and, re-imbursing himself for his special loss, he will hold
the surplus in trust for the owners. (*Post, p. 45.*)

Cases cited and approved: 93 U. S., 541; 133 U. S., 409.

16. SAME. *Same. Insurance for carrier's benefit inures to owners, when.*

Insurance for the benefit of a carrier upon the goods in his custody,
not limited to an insurance of his *liability* or his *interest*, is an insur-
ance of the whole value of the goods, and one in which the owner
has an interest. (*Post, p. 45.*)

Cases cited and approved: 93 U. S., 527; 133 U. S., 409; 1 Ell. & Ell.,
P. B., 652.

17. SAME. *Same. Parol evidence not admitted to limit effect of contract.*

And parol evidence is not admissible, in the absence of ambiguity, to
show that such insurance was intended to cover less than the whole
value of the goods. (*Post, p. 46.*)

Lancaster Mills *v.* Merchants' Cotton-press Company and Others.

Cases cited and approved: 93 U. S., 527; 133 U. S., 418; 36 Md., 398; 66 Md., 339.

18. SAME.  *Same.  Warehouseman's contract to insure construed.*

The warehouseman's obligation is to take out insurance upon the entire value, and not upon the *liability* or *interest* of the carrier only, where he agrees to receive and compress cotton for shipment by the carrier, "as well as to insure the same while in his keeping for the benefit of the" carrier. (*Post, pp. 19, 20, 47.*)

19. SAME.  *Same.  Carrier not liable for warehouseman's default.*

But the carrier is not liable to the owner for the warehouseman's default in failing to procure such insurance where he was under no obligation to have the owner's interest insured. (*Post, pp. 50–52.*)

20. SAME.  *Same.  Statements of warehouseman not binding upon carrier.*

And the warehouseman's representations to depositors that such insurance had been procured, or his promise to them that it should be taken out, are not binding upon the carrier. He is not, in that matter, the carrier's agent. (*Post, p. 54.*)

21. SAME.  *Same.  Policy construed.*

Warehousemen's policy of insurance, covering "all cotton in bales received by them as agents for the benefit of railroads, transportation lines, or owners," effects insurance of the *cotton itself*, and, though intended primarily for the carrier, will inure to the benefit of the owners also. (*Post, p. 48.*)

22. SAME.  *Same.  Warehouseman's duty when loss occurs.*

When loss has occurred under a policy taken out by a warehouseman covering goods of his depositors, he becomes trustee for the owners, and must make proofs of loss and institute necessary proceedings for collection.

23. SAME.  *Measure of damages for breach of contract to carry insurance for another.*

Warehouseman agreed to *carry* insurance for benefit of owners and carrier, covering cotton deposited with him for compression for shipment. He received cotton valued at $698,300, but carried only $301,750 insurance. There was total loss by fire without his or the carrier's fault. The owners sued the warehouseman for breach of his contract to *carry* insurance, making the carrier a co-defendant. (*Post, pp. 55 et seq.*)

Lancaster Mills *v.* Merchants' Cotton-press Company and Others.

*Held:* That complainants were entitled to recover of the warehouse-
man such damages as resulted from breach of his contract to *carry*
insurance, but not entitled to hold him as an *insurer.* ( *Post, p. 59.*)

24. SAME. *Same. Effect of owner's taking out insurance.*

But the owners, having taken out for themselves the very insurance
which the warehouseman had contracted to procure for them, and
having received payment of loss in full from their own insurer, are
entitled to recover nothing, having sustained no damage by reason
of the warehouseman's default. ( *Post, p. 55.*)

25. SAME. *Same. Transaction amounting to payment of loss.*

That is *payment of a loss,* and not a mere *loan of money,* where the in-
surer advances to the assured the value of the goods destroyed, tak-
ing an obligation that the money shall be repaid if the assured shall
recover his loss of the carrier. ( *Post, pp. 56, 57.*)

Cases cited and distinguished: 129 U. S., 129; 5 Ch. Div. Law Rep.,
569.

26. SAME. *Rights of insurer paying loss.*

But if the loss be one that should be borne primarily by the carrier or
warehouseman, as between them and the owner's insurer, then the
latter is entitled to be substituted to the assured's rights, upon pay-
ment of the loss, and to proceed, in his name, to make collection.
( *Post, p. 58.*)

Case cited and approved: Railway Co. *v.* Manchester Mills, 88 Tenn.,
653.

27. SAME. *Construction of policy.*

A policy insuring "goods on shore prior to shipment" covers cotton in
warehouse for compression for shipment by a railway carrier. ( *Post,
p. 55.*)

---

FROM SHELBY.

---

Appeal from Chancery Court of Shelby County.
B. M. ESTES, Ch.

TAYLOR & CARROLL, H. C. WARRINER, and C. W.
FRAZER for Lancaster Mills.

METCALF & WALKER and TURLEY & WRIGHT for Merchants' Cotton-press Company.

HOLMES CUMMINS for Railway Company.

### STATEMENT OF CASE.

This is one of a series of suits involving the liability of the compress company and various railroad companies for the loss of 14,000 bales of cotton, valued at $700,000, burned on the night of November 17, 1887, while in press No. 4 of the defendant compress company, at Memphis, Tenn. This particular suit is brought by the complainant, a Massachusetts cotton-spinning corporation, to recover the value of 413 bales of cotton, the defendants being the Merchants' Cotton-press and Storage Company, a Tennessee corporation, and the Newport News and Mississippi Valley Railroad Company and the Indiana, Bloomington and Western Railway, both being non-resident railroad companies. There was a decree *pro confesso* against the latter company, and a final decree fixing its liability as subordinate to that of both the other defendants; and from this decree it has not appealed. There was likewise a decree for the full value of the cotton owned by complainant against the other two defendants, the liability of the compress company being decreed as primary, and that of the Newport News and Mississippi Valley Company as secondary. From this decree each has ap-

pealed, and they will hereafter be referred to as the appellants.

The bill is filed under the enlarged statutory jurisdiction of the Chancery Court. The case, as stated in the bill, is this : That complainant purchased at Memphis, Tenn., through Wm. Bowles & Sons, cotton brokers, on November 16, 1887, 413 bales of cotton, of the value of $22,037.88, which, on that day, were delivered to the compress company—a firm engaged in warehousing, compressing, and insuring cotton for its customers—for compression and delivery to the Newport News and Mississippi Valley Company, to be delivered to the Indiana, Bloomington and Western Railway Company, " and under an agreement made both with the railway and Wm. Bowles & Sons that the same should be insured by the said cotton-press and storage company until it was in fact delivered, compressed, on board the cars of the said railway." It is then charged that on the same day the Indiana, Bloomington and Western Railway issued its bill of lading, by which it recited that it had received said 413 bales of cotton, to be delivered at Clinton, Mass. This bill of lading is made an exhibit to the bill.

The second clause therein stipulates that "neither this nor any other carrier shall be responsible for any loss or damage to said property by fire or flood while at depots, stations, yards, landings, warehouses, or in transit."

The third clause provides that each carrier whose

line is used to make the transportation shall be liable only for loss or damage on its own line.

By the sixth clause it is stipulated that " any carrier over whose route cotton is to be transported hereunder shall have the privilege, at its own cost, of compressing the same for greater convenience in handling and forwarding, and shall not be held responsible for unavoidable delays in procuring such compression."

The bill then proceeds to charge that on November 17, 1887, the day after its receipt by the compress company, it was, before compression, totally destroyed by fire, while in compress No. 4; that complainant "is informed and believes, and upon information charges, that when said 413 bales of cotton were destroyed, they were insured to their full value, under a contract with the compress company made with the Newport News and Mississippi Valley Company, whereby said cotton-press and storage company, in consideration that the said railroad company would pay it the sum of about fifty cents for each bale of cotton, to cover compressing, insurance, and loading on board of its cars, it would insure all the cotton carried over the line of said railroad to its full value, for the benefit of the owner thereof and the railway, from receipt in the compress till actual delivery on board the cars of the carrier."

It is further charged that when said cotton was destroyed "it was covered by the contract of the compress company, as insurers, to the full value

thereof, as fully and completely as though said company had issued to the complainant a policy of insurance covering the risk while the same was in the custody of that company;" that it is advised that the contracts made with Bowles & Sons, to protect said cotton against loss from its receipt until delivery to the carrier, "and with the railway company, inures to its benefit, and that it can enforce the same in this Court, especially as the Indiana, Bloomington and Western Railway is a non-resident incorporation and insolvent, and the Newport News and Mississippi Valley Company declines and refuses, though requested, to institute suit for the benefit of complainant, although its contract was made with the cotton-press company to protect complainant's loss, and did protect it."

" Complainant further shows to the Court that when said 413 bales of cotton were destroyed the Merchants' Cotton-press and Storage Company had either re-insured its own risks, or taken out insurance for the benefit of owners, to an amount exceeding $300,000, in about forty solvent companies, the names of which it has never disclosed, and which have in no authenticated way appeared."

The bill then charges that the cotton so destroyed was covered with the insurance so alleged to have been taken out by the compress company; that same was for the benefit of owners, "and that any excess over and above the insurance which had been taken out by the defendant cotton-press company it is bound to pay, unless there is double

insurance; and, in that event, it is bound to pay its proportionate amount thereof. It is but a trustee of the insurance of the cotton for the owners."

The bill then shows that complainant had a running policy of insurance issued to it by the Insurance Company of North America.

"That company claims that the risk under its policy did not attach until an actual delivery on the cars of the carrier for transportation, and that the purpose and intent of the Merchants' Cotton-press and Storage Company, the carriers and shippers, was to insure the risk from the receipt of the cotton in compress No. 4 until it was laden aboard the cars of the carrier, when the risk attached under the running policy aforesaid.

"In accordance with this view, the said insurance company has declined to pay, as a loss under its policy, but has advanced the amount thereof to the complainant until its liability is determined by suit.

"Complainant is advised that, inasmuch as by a contract between the carrier and cotton-press company the latter insured said 413 bales of cotton to its full value, it is entitled to recover on that account in precisely the same way it would be entitled to recover had the carrier taken out in an insurance company insurance covering said 413 bales of cotton while in the custody of the cotton-press company; and, being entitled to recover said amount, the insurance company which issued to it the run-

ning policy aforesaid insists that it is subrogated
to whatever rights complainant has in the prem-
ises, and therefore declines to pay as for a loss
under its policy.

" Complainant is advised that the right of recovery
of the carrier under the contract aforesaid is clear;
that it is entitled in equity to the benefit of the
contract, the proceeds standing in lieu of the 413
bales of cotton; and that, inasmuch as it can en-
force the collection thereof, and that said contract
is in writing, and in the hands of the defendant,
the Merchants' Cotton-press and Storage Company,
or a copy thereof, it asks that the same be filed
with its answer.

"And if mistaken in this view, it is advised
that it is entitled to recover the full value of the
insurance under the contract made with Wm.
Bowles & Sons, the agents of complainant, by
which, in consideration that the cotton be intrusted
to the cotton-press company, it would insure the
same, from receipt to actual delivery, for full value
for the owners. And if mistaken in this view of
the case, complainant insists it is entitled as owner
to share in the insurance effected by the defendant
cotton-press company, to the amount of $300,000,
for the benefit of owners of cotton, and which
covered its 413 bales of cotton when they were
destroyed by fire, and it is entitled to have the
defendant cotton-press company declared a trustee
thereof, and directed to pay the amount thereof
out of the collections which it has made and will

hereafter make from said insurance companies, its ratable proportion thereof."

This bill concludes with a prayer for a money decree against the compress company, and that it file list of its policies of fire insurance, and disclose what steps it has taken to collect same; that "the carrier defendants answer and disclose the contract between them, whereby the said 413 bales of cotton were to be delivered after compression to the Newport News and Mississippi Valley Railroad; and that the Indiana, Bloomington and Western Railway Company file with its answer the receipt which the compress company gave to it in exchange for the receipts which its agent, J. C. Rogers, delivered to that company, the same which were delivered to him by the said Wm. Bowles & Sons; and that the Newport News and Mississippi Valley Company file its written contract with the Merchants' Cotton - press and Storage Company, or a copy thereof, by which it agrees to transport compressed cotton only, and to pay a fixed sum on each bale of cotton to cover the insurance, to the full value thereof, compression and lading aboard the cars, to the said Merchants' Cotton-press and Storage Company; and that upon the facts of this case complainants may have all such general relief and special relief as may be proper."

The compress company in its answer admits receipt of cotton, and that it was burned as charged, but disclaims all negligence. It denies

that this cotton was received to be delivered to the Indiana, Bloomington and Western Railway Company, or that it was delivered under any agreement with the railroad company, or with Bowles & Sons, that it should be insured by it until delivery on the, cars of the railroad company. It denies that it in any manner, or to any extent whatever, agreed to become the insurer of said cotton, or to stand in the attitude as if it had issued a policy of insurance thereon. It denies that the contracts evidenced by its dray tickets issued to Bowles & Sons inured to the benefit of complainant. It insists that when the bill of lading was issued to complainant, that these dray tickets were surrendered to the railroad company and canceled, and that thereafter no further liability under the contract therein evidenced existed against it. It avers that it never had any other relations with complainant than that of warehouseman, and avers that complainant had full insurance of its own on said cotton, and has been fully paid and indemnified for said loss.

It denies any contract whatever with the Indiana, Bloomington and Western Railway Company, but admits that it did have a contract with the Newport News and Mississippi Valley Company, and files copy with its answer, but denies that it covered the cotton referred to in the bill. The compress company then set out what they state to be the usual course of business between itself and the shippers of cotton. Among other things, stat-

ing that before the cotton of a shipper will be received into its press, that such shipper must obtain a permit from the carrier over whose line he expects to ship such cotton; that upon receipt of cotton by the compress, with permit, receipts for the same are issued to the shipper; that the shipper then delivers these receipts to the carrier and takes bill of lading, the dray ticket receipts of compress company being surrendered to carrier in order to obtain bill of lading; that the carrier then surrenders such receipts to defendant, and a receipt is issued by defendant to the carrier. It admits procurement of insurance in the sum of $301,250 in solvent companies, in which respondent was named as the assured in the following form: "On all cotton in bales received by them as agents for the benefit of railroad transportation lines or owners, in the boundaries of the Merchants' Cotton - press and Storage Company, West Navy Yard Compress, situated and bounded as follows: East by the west line of Fulton Street; west by the Mississippi River; north by Auction Street; south by Market Street, Memphis, Tennessee. The liability of the insurers is to begin on the receipt of said cotton on the premises of the assured as herein described for compressing, and is to cease and terminate when removed from the platform of the Merchants' Cotton-press and Storage Company for transportation." It files these policies in Court, and insists that it is under no obligation to collect same, the insurers refusing to pay ex-

cept in so far as cotton was burned belonging to buyers who had no other insurance, and who had no bill of lading; that the insurers had admitted a liability to such owners, and had paid the sum of $52,472.26 for their use.

The answer proceeds to state the insurance obligation of the respondent, as it claims to have understood it, stating, among other things, that "the primary purpose of respondent was to perform and fulfill its contract with the carrier by insuring, for the benefit of the carrier, cotton delivered to respondent, as agent of the carrier, so long as the actual custody thereof by respondent should continue. Additionally to that general purpose, and solely for the convenience of the owners, the respondent voluntarily, and without any consideration whatever paid or promised to be paid, undertook to insure the owners, who had no other insurance, and to whom no bill of lading had issued." It insists that the written parts of the policies obtained by it are to be read and understood in the light of this purpose and of its contract with the railway lines. It insists that its only obligation to owners was to carry insurance to cover owner's interest up to issuance of bill of lading who had no other insurance.

The Newport News and Mississippi Valley Company answer and say that it did agree with J. C. Rogers, agent of the Indiana, Bloomington and Western Railway, and with the compress company, on November 10, 1887, that 300 bales of cotton,

to be shipped by Bowles & Sons, should be compressed at defendant compress company's press No. 4, on the tracks of respondent; and again, on November 12, 1887, it further agreed that 600 other bales, to be shipped by said Bowles & Sons, should be compressed at same press. "At the time of making said agreement said Rogers agreed with respondent and defendant compress company that said cotton should be shipped from Memphis, over the railway of this respondent, to Louisville, on respondent's road, and thence over connecting roads to the line of said Indiana, Bloomington and Western Railway;" that "it was understood and agreed between defendant compress company, defendant Indiana, Bloomington and Western Railway Company, and respondent, in said contracts of November 10 and 12 mentioned, * * * that said cotton so to be compressed for said Wm. Bowles & Sons, and then to be shipped over respondent's road, were to be accepted by defendant compress company, under its contract with respondent for compressing, etc., all cotton respondent might have at Memphis for shipment."

The said railway company then admits said cotton to have been burned before compression, as alleged, and avers that it is advised "the same was or should have been fully insured by defendant compress company, under its said contract with defendant above mentioned, and that, to the extent that same was insured, the compress company is a trustee for the owners, and liable, as an insurer

2—5 P

itself, for any value thereof not satisfied by such outside insurance.

It files this answer as a cross-bill against the compress company for the purpose of setting up its contract with the compress company, that complainant may have the benefit thereof, so far as in equity it may be entitled to the benefit thereof, and for the purpose of recovering freight moneys to which the railway company is entitled, and which it avers was or should have been covered by said insurance.

It was shown that this compress company had contracts with each railway line entering Memphis, and with a number of transportation lines and foreign railways having no line of their own, or none entering Memphis, but which contracted for freight with expectation of using one of the Memphis roads as the initial carrier. These contracts were in substance identical with that with the Newport News and Mississippi Valley Company, which was in the following language:

COPY OF CONTRACT BETWEEN THE COMPRESS COMPANY AND THE NEWPORT NEWS AND MISSISSIPPI VALLEY COMPANY.

THIS AGREEMENT, Made on the fifteenth day of November, A.D. 1886, by and between the Newport News and Mississippi Valley Company, hereinafter termed the party of the first part, and the Merchants' Cotton-press and Storage Company, of Memphis, Tennessee, hereinafter termed the party of the second part, and witnesseth as follows:

*First.*—All cotton which the said first party may desire to compress at Memphis, during the term of this agreement, shall be compressed by the second party alone, who shall also warehouse the same such time as may be required, and load the same, after being compressed, on the cars of the first party, as well as shall insure the same while in his keeping for the

benefit of the first party, and the price to be paid therefor by said first party shall be at the rate of twelve and one-half (12½) cents per one hundred (100) pounds, bill of lading weights for all such cotton so compressed, etc., on and prior to the thirty-first day of August, 1887, and ten (10) cents per hundred (100) pounds, bill of lading weights, for all cotton compressed, etc., thereafter during the term of this agreement. This compensation covers compressing, loading in cars, and insurance, as well as the use of the second party's grounds, sheds, platforms, and all services rendered by said second party in and about such cotton delivered it hereunder until the same is delivered to and loaded on the cars of the first party by said second party.

*Second.*—Such compressing and loading on the first party's cars is to be done by the second party promptly, and such cotton shall be compressed so that the average lading shall be not less than twenty-six thousand (26,000) pounds per car of average size.

*Third.*—Such insurance shall be taken for the benefit of the first party in good and solvent companies, so as to cover any loss while such cotton is under the second party's control, and until loaded on the first party's cars.

*Fourth.*—The second party shall be liable for any loss arising from negligence or lack of care in anywise to such cotton while under its control, agreeing to be bound therefor as a bailee for hire; and for any such loss, shall pay the first party all damages and cost, or the first party may retain any dues to the second party to cover such loss. This, however, not to be limited to the amount of such dues.

*Fifth.*—The first party hereby constitutes the second party its agent to receive such cotton for it, and sign receipts on which bills of lading may be issued when cotton is delivered in compresses or grounds in the navy yard, alongside the tracks of the first party.

*Sixth* —So far as it can legally so do, the first party agrees to establish no other compress agency nor employ any other compress to do its compressing of cotton at Memphis during the term of this contract.

*Seventh.*—In case, at any time during the term of this contract, the second party shall do for any other person the like service as herein agreed to be rendered the first party for a less rate than that above stipulated, then the first party shall pay no more than such lower rate for any compressing hereunder; and in case, during the term this contract is to run, any other compress company, organization, person, or corporation should establish other compresses at Memphis (called the Taxing District of Shelby County), Tennessee, and do, or propose to do, compressing and the other services above agreed to be done by the second party at a lower rate than that above stipulated herein, having equal facilities therefor and proposing to do such compressing in good faith, then the second party agrees and binds itself thereafter, during the time such lower rate continues in force by such competitor, to render the services and do the things hereinabove stipulated, at such lower rate so offered or done by such

Lancaster Mills *v.* Merchants' Cotton-press Company and Others.

other person, corporation, etc.    However, if, and when such competitive or lower rate is withdrawn, then the rate hereinabove fixed shall again become in force.

*Eighth.*—All bills for compressing cotton shall be paid weekly.

*Ninth.*—Said compress company guarantees correct loading of such cotton in said first party's cars and the correctness of the loading list for same.

*Tenth.*—This contract is to continue in force until the thirty-first day of August, 1896, said rate of twelve and one-half (12½) cents per one hundred (100) pounds being for one year from the first day of September, 1886, and said rate of ten (10) cents per one hundred (100) pounds for the remaining nine years, and this contract is to relate back to the said first of September, 1886, and is to cover, as to its terms, all compressing of cotton done by the second party for the first party since that date.

*Eleventh.*—The contract heretofore made between the Chesapeake, Ohio and South-western Railroad Company and the second party above, of date the twenty-fifth day of August, 1884, is hereby abrogated and annulled.

And it is further agreed, and one of the terms of this contract, that the second party will compress cotton for the first party as rapidly as it is prepared to forward same, and in case of the second party's failure to so do at any time, the first party shall have further right to arrange with others for such service during the second party's failure aforesaid.

In witness of all of which, the said contracting parties have caused the names of their respective officials to be signed in duplicate hereto.

NEWPORT NEWS AND MISSISSIPPI VALLEY COMPANY,

By JOHN ECHOLS, *Third Vice-president.*

MERCHANTS' COTTON-PRESS AND STORAGE COMPANY,  ·

By NAPOLEON HILL, *President.*

The permits under which this cotton was received by the compress company were in the following words:

Ex. 2.    Date, 11–12.    Shipper, Wm. Bowles.    No. bales, 600.    What line, Nickle Plate No. 4.    Rogers.

MEMPHIS, 11–12, 1887.

*Merchants' Cotton-press and Storage Company:*

Please receive at press No. 4 600 bales cotton.    Issued on account Nickle Plate line.

NOTE.—Not transferable; must be used for the benefit of the shipper named, and void if not used within forty-eight hours after date.

W. R. McINTOSH, *Div. Freight Ag't.*

Upon delivery of cotton from drays into the press, receipts or tickets were issued, which varied somewhat in terms. The form used by Wm. Bowles & Sons was as follows:

No. 4616.                    MEMPHIS, TENN., Nov. 11, 1887.

Received of Wm. Bowles & Sons by the Merchants' Cotton-press and Storage Company, and covered by them with insurance for the owners, as interest may appear, the following cotton, in good order, at press No. 4.

| Dray. | Marks. | No. of Bales. |
|-------|--------|---------------|
| 9 | O———†‡† | Nine B—— |
|  | < L > K | Moffatt. |

(On left margin, " For shipment via.")

(Across the face printed, " If held in the press over fifteen days before bill of lading issues, or if sold while in press, fifty cents per bale per month charges will be collected before delivery or shipment.")

To accommodate the various railway lines, compresses were erected with regard to convenience of each line, and upon the track of each line, so that cotton could be loaded from the platform of the compress into the cars of the carrier. The compress in which complainant's cotton was burned was one used by the Newport News and Mississippi Valley Company and by steam-boat lines, being on the river-bank and on the track of the railway. There was proof tending to show that the shipper of cotton usually, within twenty-four hours, delivered his dray ticket receipts to the carrier with whom he had made his contract of affreightment, and took from the carrier a bill of lading. In this case these dray tickets were delivered to the general freight agent of the Indiana, Bloomington and Western Railway, a company having no line into Memphis, and having no contract-

ual relations with the compress company nor with the Newport News and Mississippi Valley Company. The Indiana, Bloomington and Western Company could use any of several northern or eastern lines to carry the cotton to its own line of road, prorating freight under a general understanding with such roads as made connection with its own. When it issued its bill of lading it gave notice to the compress company of this fact, accompanied with directions to ship over the Chesapeake, Ohio and South-western Railroad, this being the local designation of the division of road operated by the Newport News and Mississippi Valley Railroad between Memphis and Louisville, Kentucky.

This notice and shipping direction was in the form usually adopted by carriers at Memphis. Those used in this particular case were as follows:

No. 8.   Merchants' Cotton-press and Storage Co., of Memphis:

MEMPHIS, Nov. 17, 1887.

I have this day issued on your dray receipts B. L. to Wm. Bowles & Sons for ————————————————————bales cotton.

| Marks. | No. of Bales. | Weight. |
| --- | --- | --- |
| $<$ L $>$ K | 214. | 107,200 |
| O————†††  1—500 | | |

Via Louisville and J. M. & I. Ry.

Ship the above cotton by the C., O. & S. W. R. R. for account of N. P. line.                                        JOHN C. ROGERS, *Agt.*

Part lot 500.

No. 9.   Merchants' Cotton-press and Storage Co., of Memphis:

I have this day issued on your dray receipts B. L. to Wm. Bowles & Sons for 286 bales of cotton.

| Marks. | No. of Bales. | Weight. |
| --- | --- | --- |
| $<$ L $>$ K. | | |
| 1—500.   O————††† | | |

Via Louisville and J. M. & I. Ry.

Ship the above cotton by the C., O. & S. W. R. R. for account of N. P. line.                                        JOHN C. ROGERS, *Agt.*

Balance 500.

The proof tended to show that the great mass of cotton received at Memphis came direct from plantations, and were in usual commercial bales. By compression these bales were so reduced in bulk as to enable carriage of double the number of uncompressed bales in car or vessel of carrier. At the date of this transaction the defendant compress company was the only company engaged in compressing at Memphis. The carrier gave no rate save for uncompressed cotton, stipulating in bills of lading for right to have it compressed at expense of carrier. There was proof tending to show the system of requiring permits not to have been rigidly adhered to. It was not stipulated for in the contracts between the carriers and compress company, and seems to have been adopted as a means of keeping the compress clear of cotton not intended for immediate shipment. Permits were issued by the carriers upon application of any shipper, and without requiring the person obtaining them to agree to ship his cotton over the line of the railway issuing them. The permit was regarded as a mere indication of an *expectation* that the cotton would be shipped over line of company granting them, but not as obligating the shipper to do so.

Fourteen separate issues of fact, framed under direction of the Chancellor, were submitted to a jury called by defendants. These issues, together with the responses of the jury, were as follows:

*First.*—Under what express contract—written, printed, or verbal—if any, did the defendant, the Merchants' Cotton-press and Storage Com-

pany, receive the cotton described in the bills in these causes, or any portion thereof? In response to this issue set out in full said contract.

For response to the first issue they find: That the defendant, the Merchants' Cotton-press and Storage Company, received the cotton under the following express written contracts:

1. The permits issued by W. R. McIntosh, the general freight agent of the Newport News and Mississippi Valley Railroad Company. (*Ante, p. 20.*)

2. The contract between said railroad company and the compress company. (*Ante, pp. 18–20.*)

3. Under the several dray tickets or receipts given Wm. Bowles & Sons for said cotton. (*Ante, p. 21.*)

*Second.*—Did said Merchants' Cotton-press and Storage Company assume any liabilities in respect of said cotton outside of the scope and terms of the express contract? If so, in what manner and upon what consideration, and what was the liability? Answer fully and specially.

In response to the second issue they find and answer: No.

*Third.*—If in response to the foregoing issues it is found that said Merchants' Cotton-press and Storage Company assumed a liability to carry insurance on said cotton, for whose benefit was said insurance to be carried, on what terms, and for what length of time?

In response to the third issue they find and answer: They assumed a liability verbally and according to terms of the written contracts to carry insurance for the benefit of railroads, transportation lines, or owners upon all cotton in bales while in their possession.

*Fourth.*—Who was the owner of said cotton at the time of the receipt thereof by said defendant compress company, and who was the owner when the bills of lading were given and at the time of its loss by fire?

In response to the fourth issue they find and answer: The Lancaster Mills at all three periods of time.

*Sixth.*—What was the aggregate value of all the cotton destroyed in compress No. 4 of the Merchants' Cotton-press and Storage Company on the seventeenth of November, 1887, or in consequence of said fire, and what was the aggregate amount of insurance effected thereon by defendant compress company?

In response to the sixth issue they find and answer: The aggregate value was $698,300; the aggregate insurance, $301,750.

*Seventh.*—What was the proximate cause of said fire, and what was the measure of the care and diligence of said Merchants' Cotton-press and Storage Company in using precautions against fire and in saving cotton from fire at and before the loss of the cotton, and did the Merchants' Cotton-press and Storage Company use such care and take such precautions to prevent and extinguish the fire? If not, in what respect did it fail?

In response to the seventh issue they find and answer: The jury are unable to determine from the evidence the immediate cause of the fire.

As to the measure of care and diligence used in protecting and caring for the cotton as warehousemen, the jury are of the opinion that ordinary care and diligence was used in the warehouse proper, or up-stairs, both before and at the fire, the water supply seeming ample, and the engine and hose were handled with promptness and intelligence ; but in the opinion of the jury the construction of the warehouse was faulty in some respects, especially in not being closed up on the west side, or river-front, below the level of the floor where cotton was held. The jury think this space or opening should have been closed up, or there should have been a watchman stationed under the warehouse or on the levee in front of the warehouse.

*Eighth.*—What was the custom or the mode of business in Memphis at and before said fire between shippers of cotton and compress companies touching the delivery of cotton to compress companies, and also to railroad companies over which it was to be shipped, especially in regard to dray tickets and insurance ?. Was this mode of business general or limited ? and for what length of time prior to said fire had it been generally or specially in vogue in Memphis ? Was such custom known by complainants or their agents ?

In response to the eighth issue they find and answer : The custom was : (1) The buyer or shipper procured permits from the railroad company or common carrier to deposit cotton at any press designated by the common carrier; (2) to send the cotton on drays or wagons to such designated press, and receive for said cotton the receipt of the Merchants' Cotton-press and Storage Company for it. It was generally understood by buyers and shippers of cotton that it was fully insured by the Merchants' Cotton-press and Storage Company while the cotton was in their possession. This mode of business was general for several years previous to the fire. The general mode was known to the complainant's agents.

*Ninth.*—What were the relations, contractual or otherwise, between the defendant compress company and the defendant railroad company in regard to the receipt, compression, insurance, and shipment of cotton, the surrender of dray tickets and the issuance of bills of lading therefor ; and under said relations as between themselves, at what point in the transaction did the liability of each for loss or damage by fire begin and end ? If any such relations existed by express contract, written or verbal, set out clearly and in full said contract.

In response to the ninth issue they find and answer : None further than the contract set up in answer to the first issue, and also made part of this answer as Exhibit No. 1.

*Tenth.*—Did the complainant have any insurance in its own name or for its own benefit on said cotton at the date of its loss ? If so, in what amounts, with what companies, under what character of policies, what, if any thing, has been paid or advanced to complainant on said policies,

in what shape and under what arrangement or contract, and the present status of said insurance?

In response to the tenth issue they find and answer: It had insured in its own name at the date of the loss a policy covering the value of said cotton and 10 per cent. additional. We find the value of the cotton to be $20,034.63, with 10 per cent. added, or $2,003.46, making a total of $22,038.09. Said policy was issued by the Insurance Company of North America. A copy of which policy is also hereto attached as Exhibit No. 1 to this answer, and made part hereof. It has received under said policy the sum of $22,038.09 under a certain contract which is hereto attached as Exhibit No. 2 to this answer, and made part hereof.

*Eleventh.*—When the defendant compress company received complainant's cotton, were there any instructions to it, or contract, or understanding, that it was to be received by or shipped over any particular carrier line; if so, what line, and were these instructions or this contract or understanding communicated to said carrier line before the fire?

· In response to the eleventh issue they find and answer: When the defendant compress company received the cotton of complainant, it was by permit issued by agents of the Newport News and Mississippi Valley Company for account of Nickel Plate Railroad, and defendant railroad company's agent—to wit, the ·Merchants' Cotton-press and Storage Company—was apprised of said understanding by reason of said permit, also by the shipping orders. Said permits are exhibited in answer to the first issue, and are also made a part of our response to this issue as Exhibits 3 and 4. Said shipping orders are made a part of this answer as Exhibits Nos. 1 and 2 hereto.

*Twelfth.*—How and on what representations were the bills of lading procured from the railroad company?

In response to the twelfth issue they find and answer: The bills of lading were procured on presentation and delivery of the receipts of the Merchants' Cotton-press and Storage Company on representation of complainant's agents that the cotton was in possession of said defendant compress company.

*Thirteenth.*—How long after the dray tickets were delivered to the railroad company before the fire occurred, and what shipping directions, if any, were given to that company when the tickets were received by it?

In response to the thirteenth issue they find and answer: The dray tickets were delivered to the railroad company on November 16, 1887, the date of bill of lading hereto attached as Exhibit No. 1 to this answer and made part hereof. The fire occurred on the night of November 17, 1887. Directions were given to ship over the Chesapeake, Ohio and Southwestern Railroad, as per shipping directions issued by J. C. Rogers on November 17, 1887, exhibited as Nos. 1 and 2 to our answer to eleventh issue; they are also made part of our answer to this issue as Exhibits 2 and 3.

*Fourteenth.*—What representations, if any, were made by defendant compress company to complainants, or its agents, as to its liability for cotton destroyed by fire in its presses before the fire?

In response to the fourteenth issue they find and answer: The defendant compress company represented to the agent of the complainant that the cotton in their (the compress company's) presses was fully insured, as per contract already exhibited in answer to the first issue.

*Fifteenth.*—What became of complainant's cotton, if destroyed by fire on the seventeenth of November, 1887, in whose possession was it when destroyed, and what evidence of contract or duty on the part of either of the defendants did the complainant hold at the time, and how was it secured? Set out in response hereto said contract.

In response to the fifteenth issue they find and answer: The complainant's cotton was destroyed by fire on the night of the seventeenth of November, 1887, while in possession of the Merchants' Cotton-press and Storage Company. The evidence of contract or duty on part of defendant held by complainants was a bill of lading for the cotton destroyed, and was secured on delivering dray tickets issued by defendant compress company. Said bill of lading is exhibited as No. 1 in answer to the thirteenth issue, and is also made part of this answer as Exhibit No. 1 hereto.

---

## OPINION OF COURT.

LURTON, J. This case has been very ably and elaborately argued, and we deem it not inappropriate to acknowledge our very great indebtedness to the learned counsel who have appeared in the cause.

The first question which we shall consider is as to the liability of the railway defendants for a breach of their obligation as carriers of goods. The decree of the Chancellor against them was predicated upon a supposed obligation by contract to cover with insurance the cotton of complainant. It has been, however, very much pressed upon us

that the carrier is liable upon a wholly different ground—to wit, for a breach of duty and contract as carrier—and that its 'liability in this respect is primary and absolute, regardless of any special obligation to insure. A careful examination of the pleadings discloses no allegation of fact which, as matter of law, would entitle complainant to any decree against either railway company for a liability as carrier.

The primary object in making the railway companies defendants, as indicated by the form of the original bill and the relief especially prayed, seems to have been to reach the compress company through subrogation to the rights of the railway company having a contract with the former for insurance covering cotton while in its warehouse for compression.

The bill concludes with a prayer for general relief; and if the facts stated in the pleadings are such as would entitle complainant to other or different relief than that especially prayed, then, under well-settled rules of equity pleading, such other appropriate remedy may be granted. The facts which involve any question of direct liability of the railway defendants as carriers, which are stated in the bill, are, briefly, as follows:

*First.*—That the Newport News and Mississippi Valley Company had issued its permit for the admission of this cotton into the press designated for cotton intended for shipment over its line, on account of the Indiana, Bloomington and Western Railway, a connecting carrier.

*Second.*—That this delivery to the compress company was for compression and delivery to the Newport News and Mississippi Valley Company as initial carrier, to be by it transported and delivered to the Indiana, Bloomington and Western Railway as a connecting carrier.

*Third.*—That the dray receipts of the compress company had been delivered to the Indiana, Bloomington and Western Railway, and its through bill of lading accepted for carriage of the cotton at through rate of freight from Memphis to Clinton, Massachusetts.

*Fourth.*—That the cotton was burned while yet in the actual custody of the compress company, but after issuance of bill of lading.

This bill of lading is made an exhibit to the bill, and contains, among other things, the following special stipulations:

*First.*—That any carrier over whose line the cotton may pass shall have the privilege, at its own expense, of compressing the cotton for convenience of carriage.

*Second.*—That the carrier shall have exemption from liability for loss or damage by fire "*while at depots, stations, yards, landings, warehouses, or in transit.*"

*Third.*—That each connecting carrier shall have the benefit of all the stipulations of the bill of lading.

*Fourth.*—That each connecting carrier shall be responsible only for loss or damage occurring on its own line.

On these facts it may be assumed that while the actual custody of the cotton was with the compress company at time of the loss, yet, as between the owner and the railway line, there was a good delivery to the carrier under the bill of lading, which provided especially for compression, and which accepted delivery at the warehouse of the compress company as a delivery to it. Inasmuch as the Indiana, Bloomington and Western Railway was not a line having tracks entering Memphis, and inasmuch as the bill alleges a delivery was to be made by the compress company to the Newport News and Mississippi Valley Company for carriage and delivery to the Indiana, Bloomington and Western Railway as the company issuing bill of lading and as connecting carrier, it may be assumed that the liability of the Newport News and Mississippi Valley Company was precisely the liability of the Indiana, Bloomington and Western Railway, and that the cotton was held by the compress company for compression, for and on account of the Newport News and Mississippi Valley Company, and for delivery on its cars when compressed.

The liability of both the Indiana, Bloomington and Western Railway and the Newport News and Mississippi Valley Company is to be determined by the common law, except in so far as modified by valid stipulations contained in the bill of lading. The exemption from liability for loss by fire at any " depot, station, yard, landing, or ware-

house" contained in bill of lading, is sufficiently comprehensive to cover a loss by fire in the warehouse of the compress company. In view of the stipulation for compression, before shipment, contained in the bill of lading, and the actual delivery by the shipper to the compress for compression, it would be unreasonable to hold that a stipulation for exemption while in "warehouse" did not cover cotton while warehoused for compression.

The validity of this fire clause is not questioned in the pleading, either by allegation that it was without consideration, or imposed by duress, or unreasonable for any cause. In such case, it appearing that it was contained in a through bill of lading, wherein a through rate was granted, for carriage over line of more than one carrier, it will be presumed that the stipulation was upon a sufficient consideration and reasonable. This exemption would, however, be invalid as a protection against a loss by fire the result of the negligence of the carrier or of its agent for compression. The bill fails to charge that the loss was due to any want of care, either upon the part of the carrier or of any of its agents or servants. Where, therefore, the pleadings show a valid stipulation for exemption from loss or damage by fire, and it is further shown that the failure of the carrier to safely carry and deliver was due to a loss by fire, no case is made against the carrier unless the fire be charged to have been the result of negli-

gence. The burden of proof, when the loss is thus admitted to have been by fire, is upon the owner to prove negligence, and under plainest rules of pleading the plaintiff ought to allege in his pleading every fact necessary to fix liability. *L. & N. R. R.* v. *Manchester Mills*, 88 Tenn., 653..

We are therefore of opinion that, under the pleadings, no such facts are stated as would entitle complainant to any decree against either of the railway defendants for any breach of duty as carriers. The decree *pro confesso* against the Indiana, Bloomington and Western Railway did not authorize any final decree fixing liability upon it for this loss. No relief can be granted upon a bill in equity taken for confessed, beyond the fair scope of the allegations and prayer of the bill. *McGavock* v. *Elliot*, 3 Yer., 374; *Ross* v. *Ramsey*, 3 Head, 16.

The decree actually pronounced was based upon the supposed liability of that company under an obligation to insure, and not by reason of any, breach of carrier duty. That decree is not before us for review, inasmuch as that company has not appealed; but as it is now sought to affect the defendants who have appealed, by reason of the assumed liability of the non-appealing carrier, we have felt it necessary to consider the weight to be attached to the decree against the Indiana, Bloomington and Western Railway.

*Second.*—Is the defendant compress company

directly liable to complainant as for a breach of duty as warehouseman?

The seventh issue submitted to the jury involved the degree of care and diligence required to be exercised by the cotton-press company, with regard to precautions against fire and saving cotton from fire at and before this loss.

The jury were instructed upon this issue that "if you find that the defendant compress company held this cotton at the time of its destruction as warehouseman only (that is, for storage and compression without any superadded obligation, and in this connection you need not consider the question of insurance), then the law imposed on it as the measure of its duty, ordinary care, or, as specifically stated by an eminent law writer, 'the care and diligence which good and capable warehousemen are accustomed to show under similar circumstances, or that which business men experienced and faithful in the particular department, are accustomed to exercise when in the discharge of their duties.' The warehouseman must erect a good building, reasonably suited and adapted for safe-keeping of the particular property intended to be taken care of (it need not be fire proof), and he must keep it watched in proportion to the risks he is subject to, and the value of the goods with which he is likely to be intrusted, having of course in view the position in which his building is to stand, and his capacity of thus burdening himself without incurring unjustifiable expense."

3— 5 P

They were further instructed that if they found any other duty was superadded by agreement or confidence, aside from insurance, that then they should report what such superadded duty was, and what degree or measure of care was imposed thereby, and that, in case of such superadded duty, the law imposed as the measure of care extraordinary diligence. The jury was likewise fully instructed as to the grades of diligence implied from the terms "ordinary care" and "extraordinary care."

The response of the jury to this issue, as defined by the charge quoted, was in the following words:

"In response to the seventh issue they find and answer: The jury are unable to determine from the evidence the immediate cause of the fire. As to the measure of care and diligence used in protecting and caring for the cotton as warehouseman, the jury are of the opinion that ordinary care and diligence was used in the warehouse proper, or upstairs, both before and at the fire, the water supply seeming ample, and the engine and hose were handled with promptness and intelligence; but, in the opinion of the jury, the construction of the warehouse was faulty in some respects, especially in not being closed up on the west side, or riverfront, below the level of the floor where cotton was held. The jury think this space or opening should have been closed up, or there should have been a watchman stationed under the warehouse or on the levee in front of the warehouse."

The charge of the learned Chancellor was full and without error in defining responsibility of warehousemen. *Waller* v. *Parker*, 5 Cold., 477; Schouler on Bailments, Sec. 101.

The finding of the jury must be construed as a finding that the compress · company was liable only as a warehouseman, and that neither by "agreement or confidence" had it assumed any other or higher responsibility than that of warehouseman for storage and compression. If it had assumed absolute responsibility for the safe-keeping of the goods, or direct liability for a loss by accidental fire, the jury should, under this charge, have reported such superadded duty or responsibility. Under the rule of ordinary care, this finding acquits the defendant of negligence, unless the defect in the building pointed out by the jury in some way was the proximate cause of the loss or contributed to the loss. We have carefully examined the very voluminous proof upon this question of negligence, and are entirely satisfied with the finding of the jury, and with the decree of the Chancellor holding that no negligence was established.

The defect in the building referred to by the jury does not appear to have in any way contributed to the loss, · or to have been the cause of the fire. There is a total want of connection between the negligence and the injury. This want of causal connection is fatal to any demand that a decree should pass finding a loss by negligence. The rule, as we understand it, is that "the bur-

den of proof is upon the bailor to prove the con-
tract and the delivery of goods; then upon the
bailee to show their loss and the manner of the
loss. The burden then shifts to the bailor to
establish that the loss was due to negligence."
*Runyan* v. *Caldwell*, 7 Hum., 134; *L. & N. R. R.*
v. *Manchester Mills;* Schouler on Bailments, Sec.
101.

Under this rule the burden of proof was upon
complainant to show that this fire was the prob-
able result of negligence. If this defect in con-
struction of building can be shown to have been
the proximate cause of the fire, or to have con-
tributed to the loss, then the liability is made out;
but the proof makes it absolutely certain˚that this
fire did not originate from beneath the building—
the exposed part—but that it originated upon the
heads of bales of cotton standing on end upon
the floor. At the time it was discovered it did
not cover more than the heads of three bales. If
it had appeared that the fire originated on the
floor, or beneath the floor, then a connection be-
tween the defective and exposed building and the
fire would have been rendered probable. The loss,
therefore, was not, in the opinion of the Chancel-
lor, attributable to this exposure of the under
parts of the warehouse to the invasion of the
tramp or the torch of the incendiary. In this
view we agree with him.

The answer of the defendant compress company
presents an issue of negligence which was wholly

Lancaster Mills *v.* Merchants' Cotton-press Company and Others.

unnecessary, in view of the failure of complainant
to charge negligence. No presumption of negli-
gence arises from the destruction by fire of goods
in the hands of a bailee for hire. This we had
occasion to consider at this term in *Railroad* v.
*Manchester Mills, supra.* Therefore, a bill alleging
a loss by fire of goods in hands of bailee should,
in order to make an issue, charge such loss to
have been by negligence. In view, however, of
the fact that the answer presented an issue, and
that the parties went to the jury upon the issue
thus made in the answer, we have, without com-
mitting ourselves to the sufficiency of the plead-
ing, treated the question of negligence as suffi-
ciently raised, so far as the compress company is
affected.

*Third.*—It is next insisted that under the facts
of this case the obligation of the compress com-
pany is that of an insurer against loss or damage
by fire; that its liability is not for a breach of
obligation to take out insurance, nor for damage
resulting from false representation that its policies
were sufficient in terms and amount to cover own-
er's interest in all cotton while in its compress,
but that it is liable as an insurer.

It may be assumed that the corporate powers
of this defendant were ample to authorize it to
contract with its customers that it would assume
liability for any loss by fire, whether accidental or
the result of its negligence. But did it do so?
The contracts between the railway lines and the

compress company explicitly negative any idea of such liability. These contracts require of the compress company that insurance for the benefit of the carriers should be taken "in good and solvent companies." The dray ticket receipts stated that the cotton was "covered by them with insurance for the owner as interest may appear." This form of dray ticket was not habitually used. The statement on these receipts varied, and shippers seem to have themselves dictated the terms in which this insurance obligation was stated. The following forms of dray receipts are shown to have been in use at the date of this transaction:

MEMPHIS, TENN., Oct. 20, 1887.

Received at the Merchants' Cotton-press and Storage Company No. 4, from Jones Bros. & Co., the following cotton in good order:

N. B.—It is agreed and understood that the cotton enumerated below is fully covered by the policies of insurance of the Merchants' Cotton-press and Storage Company, of Memphis.

| Marks. | No. | Cotton Bales. |
|---|---|---|
| ETON | 25 | Twenty-five B. C. |
| Jones. | | Cooper. |
| | | Me. I. |

MEMPHIS, TENN., ——, 188

Received of A. A. Paton & Co., by Merchants' Cotton-press and Storage Company, for compressing, and covered by them with insurance, the following cotton in good order at press No. ——:

If held in press over fifteen days before bill of lading issues, or if sold while in press, fifty cents per bale per month charges will be collected before delivery or shipment.

Oct. 21, 1887.

MEMPHIS, TENN., ——, 188

Received by the Merchants' Cotton-press and Storage Company, from E. L. Topp & Co., the following cotton in good order and condition, to be compressed:

If held in the press over fifteen days before the bill of lading issues, or if sold while in press, fifty cents per bale per month charges will be collected before delivery or shipment.

Oct. 22, 1887.

Lancaster Mills *v.* Merchants' Cotton-press Company and Others.

MEMPHIS, TENN., 10–1887.

Received of C. E. F. Hall, Agent, in good order, the following cotton, marked as per margin, by ————.

MEMPHIS, TENN., 9, 28, 1887.

Received at the Merchants' Cotton-press and Storage Company No. 4, from Alsobrook, Bowling & Co., the following cotton in good order:

N. B.—It is agreed and understood that the cotton enumerated below is fully covered by the policies of insurance of the Merchants' Cotton-press and Storage Company.

Subject to storage and insurance if held in the press over fifteen days before bill of lading is issued. Not transferable without charges from date of receipt.

The voluminous proof as to "course of business," "general understanding," and "local custom" has been carefully examined, and we concur with the Chancellor in holding that there was no such uniformity in the "course of business" or concurrence in "general understanding" between the compress company and the buyers and shippers at Memphis as to constitute proof of any assumption of the liability of an insurer. As to verbal agreements and representations concerning this obligation and its extent, the finding of the jury seems conclusive against the claim now asserted by complainant.

In response to the third issue of fact the jury responded that "they assumed a liability verbally and according to terms of the written contracts to *carry* insurance for the benefit of railroads, transportation lines, or owners upon all cotton in bales while in their possession."

In response to the fourteenth issue, which called for a finding as to representations made as to its

liability for cotton destroyed by fire, the jury responded that it "represented to the agent of complainant that the cotton in their (the compress company's) presses. was fully insured, as per contract already exhibited in answer to the first issue."

These. findings are abundantly sustained by the evidence, and we decide that the compress company did not agree or promise, verbally or otherwise, to assume the responsibility of an insurer against loss or damage by fire.

*Fourth.*—This brings us to a consideration of the alleged obligation of the compress company to carry insurance in terms and amount sufficient to cover the interest of owners until actual delivery to the carrier.

The learned Chancellor, in an able and elaborate opinion, reached the conclusion "that both the Newport News and Mississippi Valley Company and the compress company assumed an obligation to fully insure the cotton in the press from the moment it was received there until it was delivered on the cars for transportation."

The position of counsel representing the compress company, presented in pleadings and in argument, is that its contract for insurance of owner's interests is found alone in its dray ticket receipts, and that upon the surrender of this contract to the carrier, and the acceptance of bill of lading, the compress company ceased to bear any relation, by contract or otherwise, to the depositor of cotton, and that the carrier was substituted in the

relation of bailor formerly held by the depositor, and that the latter must thenceforward look alone to his bill of lading and to his own insurance for protection; that, on the other hand, the relation and liability of the compress company to the carrier who had taken up the dray tickets, and in exchange given its own bill of lading, is not identical with that formerly held by the depositor, but is to be determined alone by the written contract for compression existing between the carrier issuing bill of lading and the compress company. This argument concedes that the interest of owners was within the insurance obligation assumed by the defendant until terminated by surrender of the contract contained in dray ticket to the carrier. This position assumes that the dray receipts, in themselves, constitute the contract between the depositor and the cotton-press company. If conceded, it would narrow the controversy to a construction of the language of these receipts, and a determination of the effect of the transfer of them to the carrier in exchange for a bill of lading, and the subsequent surrender of same to the compress company for a different receipt. This presents altogether too narrow and contracted a view of this case. In order to determine the character and extent of this obligation concerning insurance, we must look to the course of business between the compress company and the depositors of cotton, its relations to the cotton-buyers and cotton-shippers at Memphis, its relations, contractual or otherwise, to the

carriers who issued bills of lading upon its dray receipts, and the representations concerning insurance made by its agents and officers to those doing business with it, and especially to Bowles & Sons, the agents of complainant and the depositors of this cotton.

The evidence establishes that at the date of this transaction, and for several years previous, the railway companies had no rate for compressed cotton. The rate was exclusively for uncompressed cotton in bales. The carriers were accustomed in their bills of lading to stipulate for the privilege of compression at their own expense. For many years the defendant compress company had had an absolute monopoly at · Memphis of the compression business. During this time it had contracts with every railway entering Memphis, identical in substance with the one set out in statement of the case. Under their contracts each carrier contracted to give to this defendant all cotton shipped over its line for compression. The agreement by which the carrier contracted with the compress company to issue bills of lading upon its dray tickets was undoubtedly the result of an arrangement between the carriers and shippers and compress company, and was intended to facilitate the prompt issuance of bills of lading and avoid delay while awaiting compression. The consignor of cotton was thus enabled, so soon as he could have his cotton drayed to the compress, to obtain a bill of lading, upon which he could draw for

value of shipment against his consignee. This arrangement saved capital, and interest on capital, and greatly advanced the interests of buyers of cotton on Memphis market.

The fourth clause in the compression contract with the Newport News and Mississippi Valley Company, constituting the compress company the agent for the carrier for the receipt of cotton, is the important feature of this contract. It was an essential part of the arrangement by which the carrier accepted a delivery at the cotton-press as a delivery to it, and by which the consignor assented to the stipulation permitting the carrier to have all cotton intrusted to it for transportation compressed before shipment. This agency for any particular carrier could not, with reference to any particular lot of cotton, begin until the cotton had been received for compression, and for shipment over line of a designated carrier with whom a compression contract existed. Hence arose the permit system, under which no cotton was received into the compress (as a general rule) until a permit had been granted by the carrier controlling the particular press in which the shipper wished his cotton deposited. It is true that permits were not in every instance demanded, and it is likewise true that the depositor obtaining such permit was not thereby obligated to ship his cotton out over the line granting the permit. It was regarded, however, as indicating that the depositor expected to "route" his cotton out over the line granting per-

mit. The obligation of the carrier to issue his bill of lading upon cotton so "permitted" into a particular press did not by the contract arise until the depositor's dray tickets were presented. These evidenced the fact that the compress company held the cotton for compression, and the carrier accepted the delivery to him of the dray receipts as a symbolical delivery of the cotton, though the cotton was actually in custody of the compress company, and was to remain there until compressed.

The liability of the carrier to the shipper unquestionably began when it issued its bill of lading. To protect itself it contracted that the compress company should stand responsible to it as a bailee for hire, and that it should carry insurance covering the cotton against loss by fire while in its custody. It might have limited the obligation of the bailee to an insurance of its *interest* in the cotton from date of issuance of bill of lading, or to insurance against liability upon its bill of lading. In such case, if the insurance had issued in *these terms*, the owner's interest in the insurance would have depended upon the primary liability of the carrier to the owner by reason of some breach of carrier obligation. But the carrier did not limit the obligation of the compress company to a procurement of insurance protecting only its insurable interest. In the same terms by which the compress company contracted to compress all cotton, it contracted to carry insurance upon all cotton in

its presses for compression.   Its contract was that
it should "compress all of said cotton, and shall
insure the same for the benefit of the first party."
The cotton itself was to be insured.   For the
benefit of the carrier it is true.   But a carrier
has such an insurable interest in goods intrusted
to him for carriage that it may insure not only
its interest or its liability, but the whole value of
the goods.   And in such case it may collect the
whole value, and, after re-imbursing itself for its
special loss, it will hold the surplus in trust for
the owners.   Wood on Fire Insurance, Sec. 294.
*Home Insurance Company* v. *Warehouse Company*,
93 U. S., 541.

An insurance for the benefit of a carrier upon the
goods in its custody, not limited to an insurance
of *its liability* or *interest,* is an insurance of the
whole value, and one in which the owner has an
interest.   The case of *Home Insurance Company* v.
*Baltimore Warehouse Company* is an instructive and
well-reasoned case, and meets our approval.   The
insurance in that case was taken out by warehouse-
men against loss by fire "on merchandise their
own, or held by them in trust, or in which they
have an interest or liability," contained in a des-
ignated warehouse.   It was held that the policy
covered the merchandise on storage itself, and not
merely the interest or claim of the bailee.   The
assured was allowed to recover the entire value,
holding the remainder, after satisfying their own
loss, as trustees for the owners.   The warehouse-

men were under no obligation to insure owner's interest, their warehouse receipts containing, by requirement of charter, a statement that it "was not insured by the corporation."

Evidence was offered tending to show that the insurer and assured intended only to insure the interest or liability of the warehousemen. This proof was rejected upon the ground that there was no ambiguity; that the merchandise itself was insured, and not the interest of the assured; and these plain words could not be explained away by parol. 93 U. S., 527.

The case of *London and North-western Railway Company* v. *Glynn*, 1 Ell. & Ell., Q. B., 652, is a leading case much cited. The policy was for £15,000, "on goods their own and in trust as carriers" in a certain warehouse. In an action on the policy it was held that, to the extent of the policy, the whole value of goods in the warehouse in the carrier's possession was insured by it, and not merely their interest in the goods, and that the carriers would be regarded as trustees for the owners of the amount thus recovered, after deducting their charges as carriers.

So in the case of *California Insurance Company* v. *Union Compress Company* the policy was taken out by the compress company to cover cotton "their own, or held by them in trust or on commission." It was conceded that this policy covered owner's interest; but the contention was that railway companies which had issued bills of lad-

ing upon the cotton while in the compress, and
which had been held liable, as carriers, for the
value of the cotton (the fire being result of neg-
ligence of carriers), were not beneficiaries under
the policy. It was held by the Court that the
railway companies, with outstanding bills of lading,
had an insurable interest in the cotton, and to
that extent were the owners of the cotton which
was held in trust for them by the compress com-
pany. 133 U. S., 409.

In the light of these authorities, we are of opin-
ion that the contract between the Newport News
and Mississippi Valley Railroad Company and the
Merchants' Cotton-press and Storage Company im-
posed an obligation upon the latter to insure all
cotton in their presses against loss by fire, and that
this obligation was imposed in such broad and un-
ambiguous terms as to require insurance upon the
full value of the cotton, and covering every inter-
est in such cotton.

The compress company was under no duty to
insure owner's interest, unless this contract imposed
the duty and furnished the consideration. That it
regarded this obligation as imposed would seem to
be indicated by the terms of its policies of in-
surance on cotton in press No. 4. This insurance
amounted, at date of this loss, to $301,000, and
was in about forty different offices. All of this
insurance was (in so far as the written parts of
the policy show) in the same terms and upon same
interest, and was in these words:

" On all cotton in bales received by them as agents, for the benefit of railroads, transportation lines, or owners, in the boundaries of the Merchants' Cotton-press and Storage Company's west navy-yard compress, situate and bounded as follows: East by the west line of Fulton Street, west by the Mississippi River, north by Auction Street, and south by Market Street.

" The liability of the insurers is to begin on the receipt of said cotton on premises of the assured, as herein described, for compressing, and is to cease and terminate when removed from the platforms of the Merchants' Cotton-press and Storage Company for transportation."

In express terms these policies covered " all cotton in bales received by them as *agents*," and for the benefit of railroad or owner. We attach no importance to the disjunctive " or." The clear contract was to insure the *cotton itself* in the hands of the assured *as agents;* whether agents for railroads, transportation lines, or owners, it was alike insured, and for the benefit of these different classes of persons having insurable interest. There is no ambiguity in the policies, and evidence offered to show an understanding limiting the plain and obvious meaning of the written contract of insurance was not admissible, and was properly rejected. 93 U. S., 527; 133 U. S., 418; 36 Md., 398; 66 Md., 339.

That this obligation was imposed upon the compress company primarily to secure the railway

company itself, cannot affect the fact that in securing its own protection it likewise secured the interests of owners. Many reasons might be suggested moving it to demand that the cotton itself and not merely its own liability or interest should be covered.

The obligation thus imposed upon the compress company to insure the cotton itself against any loss, during the entire period of its custody, explains the representations made by the officers and agents of that company concerning its liability to carry insurance. It accounts for and explains its representations—made orally and in writing and printed upon its dray tickets—that cotton was insured for benefit of owners; and the finding of the jury that it represented that cotton was so insured while in its press is abundantly supported. This obligation was co-extensive with its custody. It was not limited by the life of the dray ticket. It was not affected by the issuance of the bill of lading. The actual possession of the cotton remained with the compress company. The effect upon the possession of the compress company of the issuance of a bill of lading while the cotton was in fact in the custody of the compress company, was discussed in *Insurance Company* v. *Compress Company, supra.* What was there said is so applicable that we quote a paragraph: "As to the suggestion that by the bills of lading the possession of the cotton was transferred to the railroad companies, and that the policy was avoided thereby,

4—5 P

the answer is, that the cotton was still in the hands of the plaintiff, in its actual possession, and upon its premises. At most the railroad companies, by acquiring the receipts of the plaintiff and issuing bills of lading for the cotton, took only constructive possession of it; and the plaintiff, retaining actual physical possession of it, did not lose the right to effect insurance for its own benefit, and as bailee or agent, for the protection of the railroad companies. All that the railroad companies acquired was the right to ultimate possession, which passed to them by the transfer to them by the original depositors of the cotton receipts given by the plaintiff." 133 U. S., 415.

*Fifth.*—What is the liability of the Newport News and Mississippi Valley Company by reason of the failure of the cotton-press company to carry insurance sufficient in amount to cover full value of owner's interest? Was this railway company under any obligation as to insurance? The Chancellor on the facts, and upon a construction of its contract with the compress company, reached the conclusion that " the railroad company, by its contract with the compress company, in express terms assumed this obligation, and appointed the latter its agent to carry it out."

Unless the imposition of an obligation upon the compress company is the same thing in law as an express assumption of a like obligation, then this conclusion is not to be sustained. Nowhere in that contract does the railway company assume that

it is under any obligation concerning insurance. Neither are we able to give any such construction to this contract as constitutes the compress company the mere agent of the railway company in carrying insurance. If the carrier was, by law or by contract with shippers, obligated to carry insurance, then it would not escape responsibility by showing that it had required the compress to do what it was bound to do. It could not thus throw its duty upon another. The liability of the Newport News and Mississippi Valley Company was the liability of a carrier, not the technical liability of an insurer. After bill of lading issued it was not liable for a loss by fire, unless the result of negligence. This liability of a carrier, modified or not by fire clause, was one which it could carry or insure against. It was under no obligation whatever—this contract out of the way —to carry insurance either upon its own liability or covering owner's interest. In view, however, of its own liability, it was a wise and reasonable precaution to require the compress company to carry insurance for its benefit. That this contract bound the compress company to insure the cotton *itself*, and not merely the carrier's responsibility, and thus such insurance would incidentally inure to the benefit of owners, affords no reason whatever for holding the carrier liable for the failure of the cotton-press company to fully carry out its obligation. The *voluntary* imposition of an obligation of insurance incidentally beneficial to own-

ers of cotton is not in law or reason the same thing as the assumption of an obligation of insurance. The failure of the cotton-press company to carry such insurance may result in incidental damage to owners; but unless the railway company was under some obligation to insure, or that the compress company should insure, no right of action exists in favor of owners against it. There is no privity between the railway company and owners with respect to insurance. If it could be shown that the railway company had represented to shippers that cotton, while awaiting compression, was covered by the policies of the corporation employed by it to compress same, and such shipper, in reliance upon this representation, had accepted a bill of lading giving the carrier a right to have the cotton compressed, and had not, by reason of these representations, taken out insurance for himself, then an action would lie upon such facts. But no such case is made here. The most that can be said is that the general purport of the contract was known to shippers, though these contracts were private, unregistered instruments, and manifestly not intended by the carriers to influence or affect the action of shippers as to insurance. But assuming that this complainant knew the precise terms of this contract, in what way is he to draw from it the conclusion that, in case the compress company fails to insure, he may fall back upon the railway because the railway has imposed voluntarily the duty of insurance upon the

compress company? The agency of the compress company for the railway company in no way related to insurance. The body of this contract related to the terms and conditions upon which compression of cotton should be carried on for the railway company. With respect to this we must regard the compress company as an independent corporation, carrying on the business of compression for all who demanded its services. The railway company, as a large customer, required, as a condition upon which it would do business, that it should carry insurance. This was an obligation imposed upon the compress company, and not one assumed by the railway company to be executed by the former as agent for the latter. No other relation existed between the railway company and the compress company than shown by the written contract. This the jury have expressly found in response to the ninth issue. We find no reason for doubting this fact.

The compress company was regarded by all who had dealings with it as the only obligated party as to insurance. The bill nowhere charges an obligation, imposed by law or assumed directly or indirectly by the carrier, to insure or cause to be insured the interest of shippers. As stated in a foregoing part of this opinion, the relief which seems to have been contemplated by the pleader was a mere substitution of complainant to the rights and equities of the railway company under its contract with the compress company. That

these contracts between the several carriers and the cotton-press company tended very directly to suppress competition and to build up and sustain a monopoly we have no doubt; but that the monopolistic tendencies of these arrangements should have the effect of imposing an obligation of insurance not otherwise deducible from the contracts, is not so clear or understandable.

Whatever loss complainant has sustained by failing to protect itself by its own insurance, was wholly due to reliance upon the representations concerning insurance made by the compress company. The railway company entered into no direct obligations with owners concerning insurance, and made no representations, misleading or otherwise, on the subject. The obligations and representations of the compress company were not the obligations or representations of any authorized agent of the railway company, and there is nothing in this record which entitles complainant to any decree whatever against the railway company.

*Sixth.*—We come now to a consideration of the damage resulting to complainant by the breach of the obligation of the cotton-press company to carry insurance sufficient to cover full value of the cotton destroyed by fire. To the extent that it took out policies of insurance in good and solvent companies, in terms covering owners of cotton against loss or damage by fire until actual delivery to the carrier, it has complied with its obligation. As to such insurance it is a trustee for the owners, and

as trustee it is bound to make proofs of loss, and institute necessary proceedings for collection.

Assuming that the insurance in force shall be collected and distributed *pro rata*, it will leave about four-sevenths of the value uninsured by policies carried by the warehousemen. Is the defendant liable for this uninsured loss? This will depend upon the legal effect of a contract to carry insurance. A contract to carry insurance, or to cover with insurance, or a representation to a depositor that his deposit is insured, is very different in its legal effect from the absolute liability of an insurer. In the latter case the action would be upon the risk or policy for the value of the property destroyed, if within the amount of the risk. In the other cases the action would be for such damage as resulted from breach of the obligation to carry insurance. The measure of damages may in both cases be the same—the value of the property destroyed. The difficulty in this case arises from the fact that complainant at the time of this loss was covered by a marine risk in the Insurance Company of North America, containing a fire clause covering "goods on shore prior to shipment" for ten days. That this risk covered this cotton at time of loss is not disputable. Prior to the bringing of this suit an amount of money equal to the full value of the cotton burned, plus ten per cent. (that being the terms of the policy), was paid over to complainant, and a paper executed styled in the record a "borrowed and re-

ceived note." This document is in following words:

"BOSTON, MASS., January 23, 1888.

"Borrowed and received of the president and directors of the Insurance Company of North America, of Philadelphia, Pa., the sum of twenty-two thousand thirty-seven dollars and sixty-nine cents ($22,037.69), being a loan pending the investigation and determination whether the loss of four hundred and thirteen (413) bales of cotton, being part of a lot of 500 hundred bales marked <L> K, 1—500, shipped by Wm. Bowles & Sons, Memphis, under a bill of lading of the Indiana, Bloomington and Western Railway Company, dated Memphis, November 16, 1887 — said cotton reported burned at Memphis on or about November 17, 1887 —is a loss for which the carrier should be held liable; and if the carrier should be held liable, the undersigned agrees to return to the said president and directors the amount thus loaned when and to the same extent same shall be recovered from the carrier.

"(Signed)　　　　　LANCASTER MILLS,

"By HARCOURT ARMORY, *Treas.*"

The Chancellor, in speaking of this defense to this suit, thus states the issue presented by this receipt:

"The only question for judgment between the parties to this suit is whether the transaction between the complainant and the Insuranc Company of North America is a payment of this loss. If

it is, the defendant's breach of duty and of contract has not damnified it, and there can be no recovery here."

Upon a construction of this receipt, and upon the authority of the case of *Inman, Swan & Co.* v. *Railway Company*, 129 U. S., 129, the Chancellor reached the conclusion that this was not intended as a payment, but as a mere loan pending determination of the liability of the other parties supposed to be primarily liable for the loss. It would seem that if the Lancaster Mills, not relying upon the obligation of the compress company to carry insurance, had, for itself, procured other insurance in good and solvent companies, it would not be heard to say that it had been damnified by the failure of the defendant to do for it what it had done for itself. It is not, however, necessary. to determine this, for we are convinced that the transaction between the Insurance Company of North America and the complainant, and evidenced by this receipt, is in fact and law a payment and satisfaction of the loss sustained by the burning of this cotton. The substance of this transaction is that the insurer has paid the amount of its liability under the policy, subject alone to be repaid upon the contingency that the assured shall recover same from the carrier as being primarily liable. The precaution taken in calling it a loan was doubtless due to a fear that payment might affect the right of the insurer to the benefit of a recovery against the carrier.

This precaution cannot change the fact that the assured has been paid, and that this payment is to stand unless a liability shall be fixed upon the carrier, in which case the recovery from the carrier is to inure to the benefit of the insurer. The precaution was unnecessary. If the liability of the insurer was secondary, and it pays the loss, it is substituted to the rights of the assured against the party primarily liable, and may maintain a suit in the name of the assured for its benefit.

If the carrier or compress company is, as between it and the insurer of the owners, primarily liable, then an action in the name of the assured may be maintained for the benefit of the insurer, and the fact of ·payment will not affect the recovery. This we expressly decided at this term in the case of *Railroad* v. *Manchester Mills*, 88 Tenn., 653.

The case of *Inman, Swan & Co.* v. *Railroad, supra*, is not in any way in conflict with the conclusion we reach as to effect and meaning of this borrowed and received note. In that case it appeared that cotton in the custody of a railway company was destroyed by fire. The carrier's bill of lading stipulated that it should have the benefit of any insurance held by owner on goods destroyed by fire while in its possession. On the other hand, the owners held open policies of insurance on the burned cotton, which provided the assured should, in case of loss, transfer to the insurer his claim against the carrier, and

providing that the insurance should be forfeited in case any agreement was made by the assured whereby the insurer's right to recover of the carrier was released or lost. The owners filed proofs of loss, and their open policy was re-instated for original amount. They then entered into an agreement to prosecute their claim against the carrier as the party primarily liable, and the insurer agreed to allow interest on the claim until collected.

The Court held that this stipulation did not amount to a payment; that the policies were not available to the carrier, inasmuch as the liability of the insurers depended upon the condition of resort over against the carrier. It was also held that the insurers under their contract had the right to require the assured to proceed first against the carrier, and to decline to indemnify them until the question of the carrier's responsibility was first settled. That case and this are totally unlike both with respect to the fact of payment (for no money was paid or loaned to the assured) as well as in the more important distinction that there the carrier's liability was primary as between it and the insurer. So we hold: First, that in point of fact the complainant has received payment for its loss from its own insurer; second, that this fact of payment would not prevent the maintenance of a suit for the benefit of the insurer of the owner in the name of the assured, provided the loss is one which the defendants ought to have

paid as between them and the insurer of the owners. If the liability of defendants, or either of them, was a direct one—as for negligence, or by contract for the absolute "*safe-keeping*" of the cotton—then the liability of defendants would be primary as for a loss proven or presumed to have been caused by them. In such case the insurer of the complainant would be subrogated to the right of the assured against the party primarily liable. This distinction is very clearly and forcibly illustrated in the case of the *North British Insurance Company* v. *London, Liverpool and Globe Insurance Company,* 5 Chancery Division, Law Reports, 569.

As this case has been much relied upon by the learned counsel for complainant, we briefly state the facts of the case. The case was this: A firm of warehousemen "being by *express agreement,* or a local custom of London," liable for any loss or damage which occurred to grain warehoused with them, for their own protection took out policies on grain in their custody. The owners of certain grain so warehoused, although they had the primary liability of the wharfingers, for their better protection took out policies in another company upon their interest in the same grain. A loss occurred. The wharfingers' companies and the bailors' companies contributed to a fund to re-imburse the warehousemen, who had paid the loss to the owners of the grain. The suit was one between the respective companies to determine how the loss should be borne between themselves. It was held

Lancaster Mills *v.* Merchants' Cotton-press Company and Others.

that the wharfingers' companies were liable for the whole loss, notwithstanding there was the usual clause requiring contribution where there was double insurance. The decision was rested upon the ground of the primary and absolute liability of the warehouseman to the owner of the goods in his custody. If the wharfinger had taken out no insurance, and the insurer of the owner of the grain had paid the loss, it would have been substituted to the assured's right of action against the wharfinger, who was absolutely and primarily liable. The warehouseman had by his insurance protected himself against this primary responsibility. It was held, therefore, not to be a case of double insurance, but of separate insurance upon entirely different interests.

Here the essential fact which would entitle the insurer of the owner of the warehoused cotton to recover is missing—that is, the primary and absolute liability of either the carrier or compress company. The liability to the owner for a breach of obligation to carry insurance is not a primary liability as between the compress company and the insurer of the owner. By subrogation the insurer obtains no right which the assured could not enforce. As the assured did for itself just what the compress company agreed to do for it, and having no right of action save for premiums, its insurer, who has paid the loss, has none. Whatever rights the insurers of the complainant have against the insurers of the defendant compress company for contri-

bution must be settled in a suit between themselves. These insurers are not parties, and we therefore express no opinion upon this question.

The decree of the Chancellor holding that complainant had not been indemnified by its own insurer, was erroneous, and this results in dismissal of complainant's bill, with costs.